OLGA PAFFEN, complainant,

*v.*

PAUL JOSEPH PAFFEN, defendant.

[Decided March 9th, 1923. Opinion filed March 12th, 1923.]

1. Where a husband and wife obtain a divorce in this court by collusion between themselves, and three years from the time of entry of final decree the wife files a bill of review for the purpose of setting aside the divorce as fraudulent, the bill will be dismissed because the parties are in *pari delicto.*

2. *Nichols* v. *Nichols, 25 N. J. Eq. 60,* approved and followed.

---

On bill, &c.

*Mr. Emil J. Hoos,* for the complainant.

*Mr. Randolph Perkins* and *Mr. George Link, Jr.* (of the New York bar), for the defendant.

BENTLEY, V. C.

This matter comes on under a bill of review filed pursuant to an order regularly obtained. The bill charges, that after the parties had executed articles of separation on the 25th day of August, 1915, and while the defendant was paying the complainant $40 a month for the support and maintenance of herself and their infant son, he, in consideration of continuing to pay said sum as long as the complainant should live, persuaded the complainant to sign a petition for divorce and go through the necessary steps, including testifying before a special master, to an interlocutory and final decree; that such divorce suit was of the class commonly denominated "uncontested."

The final decree was dated and filed March 11th, 1918, and not until recently before the filing of the bill herein did she discover the fraud charged to have been prepetrated upon her; that she was not a resident of the State of New Jersey, but was a resident of New York at the time the petition.for divorce was filed; and that, by reason of her ignorance of the English language, she did not know that she was signing an affidavit to a petition for divorce but was fraudulently misled by the defendant and his agents into believing that the paper to which she attached her name was for the purpose of insuring the provision of alimony for herself and child. This bill was filed pursuant to the regular practice under an amended petition showing the discovery of matters which came to her knowledge too late to be set up or taken advantage of in the original suit.

The answer denies all of the charges of fraud in the bill.

The petition for divorce was based upon desertion, and was filed on February 27th, 1917. It was signed by her solicitor, and the usual affidavit of non-collusion sworn to by her. The defendant was served personally on March 1st

of the same year, and the matter came on for hearing before William F. Gaston, esquire, as special master, on the 7th day of September, 1917. . The special master's report, dated October 20th, 1917, was filed October 22d, 1917; and then the cause slept, apparently for lack of corroboration of the petitioner's residence, until April 4th, 1918, when the deposition of one Anna Heisler was taken before the special master in which she testified that she knew both of the parties and that the petitioner resided in Plainfield. The next step was the making and filing of a decree *nisi* on August 31st, 1918, and the final decree in the following March, as mentioned above.

So far as the charge of fraud practiced upon the complainant is concerned by reason of her alleged ignorance of English, no difficulty is experienced in disposing of that. Several times she admits that she carried on conversations in our language, as, for instance, at the hearing before the special master. She testified that she is now fifty-four years of age, although from her appearance and other facts in the case I am inclined to believe that she has availed herself of the usual privilege of a woman, and that, in fact, she is considerably older. She is a woman of some experience and by no means deficient in ordinary understanding. She had lived in this country at the time of her divorce suit for at least thirteen years, bringing up a family of children, and apparently living the usual life of a woman of her age and circumstances and undoubtedly knew considerable English. Besides that, on several occasions, when hotly pressed by counsel on cross-examination, she answered his questions before the interpreter could put the same to her in German, and on at least one occasion replied in English perfectly understandable to me who am not acquainted at all with the German language. Besides that, as to her ability to speak English, the colloquy attending her first appearance on the stand did not impress me as being ingenuous on her part, and I thought at that time she was able to speak and understand English well enough to testify without an interpreter. If, as I firmly believe, she had the ordinary understanding of our language that would be at-

tained in thirteen years' residence in New York, it is incredible that she could have been so stupid as to have proceeded through the divorce suit from beginning to end without a suspicion on her part of what was being done.

Perhaps most striking of all was her letter of October 17th, 1917, one month and ten days after the hearing before the special master. In that letter, a translation of which was agreed upon, she says:

"Dear Paffen:

A few days ago I won in the Passaic court my divorce against you and you are ordered to pay $40 per mo. as long as the boy is not of age. I have no further legal rights toward you as long as you meet your obligation. As Mr. Geyer and Mr. Davidson, my attorney, told me, can I as well as you marry again after six months. Much luck.

.              With regards,

Miss Olga Paffen."

If this had stopped at the end of the first sentence, perhaps it might be said that she had no knowledge of what a divorce was; but, taken in connection with the explanatory sentence following it, and especially that where she calmly announces that either of them may remarry, such a supposition is exploded. Nobody in any civilized country could fail to understand the pronouncement of a court, the result of which is to permit the parties, or either of them, to remarry. Furthermore, she, herself, testified that she had been divorced before marrying the defendant, so that in this respect she was a woman of some experience.

In another letter, written on February 19th, 1921, after asking him, because of being out of funds, to help her out with some of the new clothing required by their son, she leads up to the real purpose of her missive and says:

"Dear Paul, can't you arrange it so we are alone once for two hours, you know for what; a man gets always what he wants but I never would like to try it with another man, as I am too afraid. Don't you remember that you promised me you would remain my friend—did you forget that? Please let me hear from you.

Regards, O L G A."

In this letter the final sentence is very significant—"Don't you remember that you promised me you would remain my friend—did you forget that?" Why did he promise to remain her friend? If she, in fact, was proceeding against him in a suit to compel him to discharge his financial obligations to her, why was he making protestations of continued friendship? The true explanation, I think, will occur to any one who has had experience in these affairs. Her excuse that these letters, or either of them, was written under duress is ridiculous and disproved by the regularity of the handwriting.

It is human nature and common knowledge that a man who is tired of his wife and is without grounds for divorcing her, will agree to almost anything to persuade her to divorce him so that he may be free again. I am convinced that Paffen, for reasons I will explain later on, prevailed upon his wife to commence a divorce suit, and that the continuance of his friendship to which she alludes was promised by him so that she would not feel that she was to be left without means to face the world.

The testimony of Mr. Gaston is very persuasive that this woman testified before him without an interpreter, and the examination of her deposition at that time corroborates the fact in that there is nothing, either in that or in the report accompanying it, to indicate that she was not capable of understanding and talking the English language, and he recited upon the stand his recollection of her testimony, showing the facts upon which her suit was predicated.

The other aspect of the bill is a charge of a fraud committed upon the court and against the laws of this state.

The complainant says that knowing her to be a resident of the State of New York and not of New Jersey, the defendant fraudulently prevailed upon her to swear falsely to facts that would give the court jurisdiction, to wit, that she had been a *bona fide* resident of the State of New Jersey continuedly since her marriage down to the time of the filing of her petition. That was not true. The testimony of the complainant to this effect is overwhelmingly

corroborated by her witnesses and admitted by the defendant on his cross-examination; and, for the reasons just given, I am of course also driven to the conclusion that she well knew what she was doing, and that her hands were no more clean than were those of the defendant.

There is no escape, so far as I can see, from the conviction that what, in truth, took place between these parties was a collusive agreement that the complainant should commence a suit for divorce, in consideration of the defendant paying her the sum of $40 per month as long as she should live, to which no defence would be interposed. Throughout the proofs appears the hand of a man named Robert P. Geyer, a disbarred lawyer and a former convict, on his own admission. This man was an intimate acquaintance of the defendant. They met constantly, over a period of years, upon purely social occasions. They played cards with one another, and they met in cafes at different places, at which—and the fact was apparent that they are all of German descent—it is not unreasonable to suppose that they engaged in the German custom of moderate but most friendly convivialities. The defendant knew of the knowledge of the law possessed by Geyer. He discussed with him, upon at least one occasion, his domestic difficulties. It was to Geyer that the parties turned for legal assistance when he drew up the articles of separation between them; it was to Geyer that he turned, thirteen days before the complainant swore to her petition for divorce. It was twelve days before that affidavit was made that Geyer replied by his letter of February 14th, informing the defendant of the grounds upon which a divorce could be obtained in New Jersey and offering his services, as he himself frankly states, in behalf of either one of them who might desire the same. This is in keeping with the man's record and his appearance on the stand, and the offer to act upon either side is strongly corroborative of my belief that this suit was manufactured with the knowledge and consent of both of the parties. Geyer was a most friendly witness to the defendant, and he admits that he wrote the letter in question, in fact, produced it himself, giving a

very lame excuse for his possession of this document and the loss of nearly all of the rest of the files in the divorce suit.

He testified with the greatest effrontery that he had neither expected nor received any compensation for the trouble and time he devoted to the divorce suit, and, as an example of his character, it need only be pointed out that men engaged in such business as this do not devote their time gratuitously, and he had evidently forgotten that in his letter of February 14th, to the defendant, after explaining that the legal expenses would be at least $150 he said "this is not including for my time and services which we can easily agree upon."

It is most significant that the defendant, who had not heard the witness Geyer testify, denied that he had ever taken up the subject of divorce with Geyer, and persisted in his denial after being shown the letter just mentioned. It is significant not only as showing the credence to be given to his testimony but as indicating the determination to confess nothing that would implicate him with Geyer. Also strongly indicative of the defendant's guilt is the fact that for two days on the final hearing he did not appear, and only presented himself after counsel for the complainant had called for his presence and the court had indicated to his counsel the dire inferences to be drawn from his failure, if innocent, to present himself and deny the charges against him.

The further fact has remained unexplained, that Geyer, only a year and half before the filing of the petition for divorce, had himself drawn *and witnessed* the execution of the articles of separation which he, as a former member of the bar, knew stopped the running of the statute so that if continued desertion on the part of the wife had existed it had been obstinate only from some time after the 25th of August, 1915, which was less than two years. This, taken in connection with his proved friendship with the defendant, the correspondence between him and the defendant concerning a divorce, and the character of the man, seem to me to prove beyond question that the whole thing was the creature of the brain of Geyer, instigated and solicited by

the defendant, and which, for the reasons already given, must have been known to the complainant.

There were subpœnaed for the hearing on the first day two women—mother and daughter—both of whom disregarded the processes. The mother, by a special order, was brought in on the second day of the hearing and undertook to excuse her absence and that of her daughter on the ground that the daughter, who has been referred to as Anna Heisler, was so ill as to make it impossible for her to attend. This was true, as will immediately appear.

Anna Heisler, whose name is really Anna Bonnano, was subsequently examined in her bed in a hospital. She was the witness in the divorce suit who was produced in the spring of 1918, and corroborated the complainant in her testimony in the divorce suit, as to her *bona fide* residence.

The deposition of Mrs. Bonnano clearly shows that she, too, must have been part and parcel of the conspiracy into which the parties entered for the collusive decree. When she was served with process by the complainant's solicitor she denied her identity and said that Anna Bonnano was on an automobile trip to Canada. The witness, when examined, still stuck to the story that at the time of service she was upon such a journey, although her examination by counsel for the complainant clearly indicates that she was not telling the truth. It is incredible that she could have forgotten all the circumstances of such a holiday. Her testimony, like that of Geyer, Hoke, and every other witness for the defendant with the exception of Mr. Link, is most unsatisfactory. Hoke does admit that the complainant and defendant were both residents of New York and both desirous of a divorce at the time of the hearing in the divorce suit and prior thereto.

Thus, a decree of divorce existing, and the complainant's charge of her innocence being disproved, it seems to me that there is no escape from the conclusion that this was a collusive suit of the most flagrant sort. So far as I am aware, the precise situation disclosed by the proofs has not been passed upon by the courts of this state. There are a number

of instances where decrees of one of our sister states have been considered where the successful party in a divorce suit has attacked the decree upon grounds similar to those alleged in the case in hand. Chancellor Runyon, in *Nichols* v. *Nichols, 25 N. J. Eq. 60,* considered the case of a collusive decree rendered in the State of Indiana. He held that the court having jurisdiction of the subject matter, and process having been served, the failure of the complainant to attack the decree for a period of four years and after her husband had contracted a second marriage, barred her from relief. He quoted from *Singer* v. *Singer, 41 Barb. 139,* as follows:

"Where the judgment of divorce has been acquiesced in for the period of several years, and the plaintiff has again been married, some better reason than the mere gratification of personal feeling or the desire to obtain a further sum of money from the plaintiff should be made clearly to appear before the court would be warranted in granting such an application. The ground on which such an order would be made would be one of public policy, but no such reason would suffice where, after the acquiescence of both the parties in the judgment for three years, an innocent person has been involved by marriage, and the opening of the judgment would involve her in distress and perhaps disgrace. The reason alone would be sufficient to justify me in denying the motion if there were no other reasons for doing so, and leaving the parties to the consequences of their own acts and agreements after the long delay that has taken place."

Bishop, in his work on *Marriage and Divorce* (at § *1548 vol. 2*), says:

"Mutual fraud, of which the common instance is collusion, and which is available to third persons in interest, cannot be brought forward by either of the parties against the other as ground for reversing any step in the cause or vacating the sentence."

In the case of *Karren* v. *Karren*, a Utah case, where the husband prevailed upon his wife to consent to a decree of divorce so that he might gain property from his family which would otherwise not be given him, upon his promise to re-

marry her after securing the same, a decree was refused, on the ground that it was against the policy of the state. It is said:

"While a decree of divorce obtained by collusion of the parties, or by the suppression of the facts, or false testimony, is a fraud upon the court, and against public policy, it would be more against public policy to disturb the decree at the instance of either of the parties who are in *pari delicto,* when, after the divorce, as in this case, one of the parties has remarried."

This case may be found in *60 L. R. A.* (at *p. 294*), with an exhaustive note reviewing the subject under discussion.

To like effect is the later case of *Robinson* v. *Robinson, 138 Pac. Rep. 288,* reported in *51 L. R. A. (N. S.) 534,* with cases later than the *Karren Case* digested in a supplemental note. The rationale of these authorities is set out in *9 R. C. L. 451,* quoting from the leading case of *Prudam* v. *Phillips,* reported in *Harg. Law Tr. 456:*

"If both parties colluded in the cheat upon the court, it was never known that either of them could vacate the judgment."

In my opinion, flagrant as was the fraud of the defendant in prevailing upon his wife to deceive this court in the divorce suit, she cannot be heard to complain if the court, at this late day, in view of her equal guilt, refuses to hear her plea. Had she moved promptly after the entry of the decree *nisi,* or even the final decree, a different situation would have been presented for consideration. But it is evident, as was the situation animadverted on by Chancellor Runyon in *Nichols* v. *Nichols, supra,* that this bill is filed for the purpose of securing alimony, because so long as she was paid under the corrupt agreement between the parties she remained mute. Under every dictate of policy she cannot now, when he refuses to live up to an illegal contract, secure the desired action by this court.

I will advise a decree dismissing the bill.